OPINION OF THE COURT
Edwin Kassoff, J.
This is a proceeding pursuant to article 81 of the Mental *696 Hygiene Law, seeking the appointment of a guardian for the property management and personal needs of the alleged incapacitated person, James Kustka. The petitioner is the granddaughter of the alleged incapacitated person.
The evidence adduced at the hearing revealed that 81-year-old James Kustka resided in Woodside, New York with his wife of 50 years until she passed away on June 9, 1994. Some three months later, in September 1994, James Kustka married Anna Vidovenyczova (Anna), a live-in home-care attendant who had been hired in July 1991 to care for his ailing wife, Emily Kustka. Anna remained in the residence following Emily Kustka’s death and is a Czechoslovakian national who began working for the Kustkas soon after arriving in the United States. Besides petitioner, James Kustka’s blood relatives include two brothers and three grandsons.
At the hearing, the petitioner stated that following Emily Kustka’s death, she began to notice a change in the mental state of her grandfather. She testified that he became forgetful and confused and began to doubt petitioner’s devotion to him. She explained that she usually ran errands for her grandfather and provided medical assistance for him. Petitioner also stated that James Kustka suffered from a severe heart condition for which he was taking various medications.
Petitioner maintained that Anna has been withdrawing large amounts of money from the bank accounts of James Kustka and sending the money to friends and relatives in Czechoslovakia. Specifically, she testified that on February 7, 1994, a certified bank check in the amount of $4,500 was drawn on a joint account in the names of James Kustka and Anna and made payable to Daniela Hubalkova, one of Anna’s daughters. In addition, petitioner stated that on April 7, 1994, another certified bank check in the amount of $21,000 was drawn on the same account and made payable to Edit Semivanova, another daughter of Anna. Petitioner also alleged that since 1992, checks have been routinely issued from the checking account of James Kustka which were payable to Tatra Travel/Vista Travel in the aggregate amount of $25,939. Tatra Travel is a Slovakian travel agency which transports individuals to and from Czechoslovakia. Petitioner does not seek to be appointed as guardian herself, but rather wishes to have an impartial individual named by the court as guardian.
Also testifying at the hearing was the court evaluator who met with James Kustka and issued a report. The court evalúa *697 tor testified that James Kustka was aware of the guardianship petition and was upset that this relief was being sought. After reviewing the financial records of James Kustka, the court evaluator stated that thousands of dollars had been dissipated from James Kustka’s accounts over the last three or four years. He ascertained that some of the funds went to Anna’s relatives in Czechoslovakia and added that Anna had commingled her own funds with James Kustka’s to such an extent that Mr. Kustka was uncertain as to the extent of his actual finances. With regard to James Kustka’s personal needs, the court evaluator stated that James Kustka is capable of functioning on his own. He is able to drive, express his thoughts clearly, and keep his house clean. The court evaluator strongly recommended that a guardian should be appointed to manage the property of James Kustka but felt that Anna should not be given control over his finances because of the serious discrepancies that had arisen.
At the hearing, James Kustka testified that he would like Anna to serve as the guardian of his property. Earlier, however, during the interview with the court evaluator, he stated that he had no objections to having his brothers serve as coguardians. His brothers agreed to consider serving as co-guardians, but refused to fully commit themselves.
Anna also testified at the hearing and admitted that she withdrew $21,000 from her joint account with James Kustka. She stated that she made the withdrawals despite being served with court papers prohibiting her from withdrawing any funds from the bank accounts of James Kustka. Anna claimed that this was money she had earned while working for the Kustkas.
Article 81 of the Mental Hygiene Law was enacted in July 1992 following a study of the procedures and practices present in former articles 77 and 78, the conservatorship and committee statutes respectively. Former article 77 authorized the appointment of a conservator for persons whose ability to care for their property was substantially impaired. Under former article 78, a committee would be appointed for individuals found to be completely incompetent. However, the standards used in applying these two statutes presented problems. The conservatorship statute was designed to deal only with property and financial matters. On the other hand, the committee statute was not a viable alternative since it required a finding of complete incompetence, a drastic finding, which often led to a loss of an individual’s civil rights. The courts became reluc *698 tant to invoke article 78, and the two statutes had the practical effect of limiting the judiciary. The Legislature, thus, was faced with the dilemma of how to assist individuals who needed more than a conservatorship but less than a committee.
Article 81 was enacted to provide the flexibility that was lacking in the former statutes. It allows a guardian to be appointed for one’s personal needs, property management or both (see, Mental Hygiene Law § 81.02 [a]). Article 81 is based on the concept that the "needs of persons with incapacities are as diverse and complex as they are unique to the individual” (Mental Hygiene Law § 81.01). The powers given to the guardian under article 81 are only those powers the guardian needs and no more. In this way, the statute seeks to foster the least restrictive form of intervention consistent with an individual’s self-determination (see, Mental Hygiene Law § 81.02 [a] [2]). In addition, the personal wishes, preferences, and desires of the individual will be taken into account.
Article 81 provides a two-prong test for determining whether a guardian should be appointed for an individual. Under section 81.02 (a) of the Mental Hygiene Law, the court can appoint a guardian for a person if it first determines the appointment is necessary to provide for the personal needs or property management of the person. In reaching its determination for this first prong, the court considers all evidence including, but not limited to the report of the court evaluator and "the sufficiency and reliability of [all] available resources” (Mental Hygiene Law § 81.02 [a] [2]). To satisfy the second prong, the individual must agree to the appointment or must be incapacitated (Mental Hygiene Law § 81.02 [a] [2]). Under section 81.02 (b), a determination of incapacity must be based on clear and convincing evidence that the person is likely to suffer harm because he is unable to provide for his personal needs and/or property management and he cannot adequately understand and appreciate the nature and consequences of his inability. The burden of proof is on the petitioner (see, Mental Hygiene Law § 81.12 [a]).
Article 81 further requires the court to give "primary consideration” to one’s functional level and functional limitations in making a determination of incapacity (Mental Hygiene Law § 81.02 [c]). This functional evaluation considers how an individual manages his activities of daily living, such as eating, shopping, dressing, and money management (see, Mental Hygiene Law § 81.03 [h]). Specifically, the court may *699 look at one’s physical ability to write checks and manage currency; ability to dress and undress; ability to buy and prepare food; cleanliness of environment; ability to walk and climb stairs; access to helpful resources, such as relatives, physicians, and transportation; and emotional factors, such as loneliness and anxiety.
Moreover, even if all the elements of incapacity are present, the comments by the Law Revision Commission emphasize that a guardian should only be appointed as a last resort and should not be imposed if available resources or other alternatives will adequately protect the person (see, Law Rev Commn Comments reprinted in McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.02, 1994 Pocket Part, at 241).
In reaching its determination on whether or not to appoint a guardian for an individual, medical testimony may not be necessary in all cases. There do not appear to be any reported cases discussing the issue whether medical testimony is required in a proceeding pursuant to article 81. The former law encouraged the use of diagnostic labels or conclusory statements and cases brought under article 78 often required medical testimony in order to sustain a finding of incompetency. There is nothing in article 81, though, which mandates medical testimony in a guardianship proceeding. However, even when medical testimony might be necessary in certain cases under article 81, an individual’s disease or underlying medical condition is only one factor to be considered by the court since the focus of article 81 is on one’s functional limitations. Functional limitations of an individual can sometimes be determined without the need for medical testimony. It is often possible for a nonmedical person to determine whether or not an individual is capable of dressing, shopping, cooking, managing their assets, and performing other similar activities.
In addition, one of the goals of article 81, to provide a guardianship tailored to meet an individual’s particular needs, will not be met if the court relies solely on the testimony of a physician in reaching its determination. The court needs to know more than an individual’s diagnosis in order to create a limited guardianship. It must know how the individual is capable of functioning in daily life. This way the guardian is given only those powers which he needs. Thus, medical testimony alone is not sufficient to make this determination and medical testimony may not be needed.
*700 Furthermore, as noted above, the various sections in article 81 do not specifically require medical testimony in a guardianship proceeding. Indeed, section 81.02 states that in deciding whether to appoint a guardian, the court shall consider the report of the court evaluator as well as the sufficiency and reliability of all available resources. The definition of " 'available resources’ ” in section 81.03 (e) includes visiting nurses, homemakers, home health aides, powers of attorney, trusts, and representative and protective payees. It does not mention physicians. Had the Legislature intended for the court evaluator to consider medical testimony, it could have specifically listed physicians in section 81.03 (e).
With regard to the property and financial affairs of Mr. Kustka, the court finds that the appointment of a guardian is needed to protect the assets of Mr. Kustka. The evidence shows that at a minimum, Anna has engaged in questionable financial transactions with Mr. Kustka’s assets. As noted above, on February 7, 1994 Anna drew a check on her joint account with Mr. Kustka in the amount of $4,500, made payable to her daughter in Czechoslovakia, Daniela Hubalkova. In addition, Anna drew another check on this account in the amount of $21,000 made payable to Edit Semivanova, another daughter in Czechoslovakia. According to the report of the court evaluator, there has been extensive commingling of Anna’a funds with those of Mr. Kustka’s, and Mr. Kustka is uncertain as to what his own assets actually are. Mr. Kustka stated that he had about $57,000 while Anna had approximately $47,000 in various accounts. However, the court evaluator noted that according to bank records, Mr. Kustka should have at least $83,000 in one account. The court evaluator concluded that tens of thousands of dollars of Mr. Kustka’s funds have been dissipated during the last few years.
Moreover, the court had the opportunity to listen to and observe Mr. Kustka testify firsthand and notes his demeanor and the confused manner in which he testified regarding his financial affairs. Based on the above evidence, this court concludes that there is clear and convincing evidence that Mr. Kustka is likely to suffer harm because he is unable to provide for his property management and cannot understand and appreciate the nature and consequences of Anna’s actions with regard to his funds. Thus, this court is able to determine through a functional evaluation that Mr. Kustka needs a guardian to manage his property. The instant case illustrates *701 that the testimony of a physician is not always necessary in an article 81 proceeding.
The court finds that a guardian is not necessary to care for the personal needs of James Kustka. It has not been shown by clear and convincing evidence that at the present time Mr. Kustka is likely to suffer harm because he is unable to provide for his personal needs. Neither the report of the court evaluator nor the hearing testimony of Mr. Kustka provide any evidence indicating that Mr. Kustka is unable to care for his personal needs. When interviewed by the court evaluator, Mr. Kustka was dressed nicely and responded appropriately to each question. He kept his house clean and organized and is still able to drive his car. At the hearing, Mr. Kustka answered all questions regarding his family and clearly expressed his wishes regarding his future.
The court usually gives great weight to the desires of the alleged incapacitated person over whom to appoint as guardian, and if appropriate, will appoint a relative or friend. However, in the instant case the court will not appoint Anna to serve as the property management guardian for Mr. Kustka. The court concludes that Mr. Kustka cannot adequately understand and appreciate the nature and consequences of his functional limitations, and therefore cannot agree to appoint Anna as his guardian. There is clear and convincing evidence that Mr. Kustka is likely to suffer harm, such as further dissipation of his assets, because he is unable to provide for his property management and cannot adequately understand and appreciate the nature and consequences of his inabilities. Though it is the usual practice of the court to appoint as fiduciaries the next of kin, close blood relatives or their nominees, the court can depart from this principle and appoint a stranger where the relatives would have an interest adverse to that of the alleged incapacitated person (see, Matter of Weisman, 112 AD2d 871; Matter of Judas, 74 AD2d 874). As discussed above, the court finds that Anna’s interests are adverse to Mr. Kustka’s.
In view of the foregoing, the court will appoint an independent guardian for a period of six months, who will fully investigate all of the financial transactions that occurred regarding the funds of the alleged incapacitated person, James Kustka. The guardian shall investigate whether any criminal or civil wrongs occurred, and if any criminal wrongs took place, will report them to the District Attorney. The guardian shall further attempt to trace the $21,000 missing from Mr. *702 Kustka’s bank account. The guardian may request the court to take action against the parties that received this money, whether they received it innocently or not, by way of turnover proceeding or plenary proceeding.
The guardian shall further investigate and examine whether or not Mr. Kustka was competent to enter into a marriage with Anna. The guardian, if he be so advised, may commence a plenary action to annul the marriage.
The court further empowers the guardian to authorize the access or release of confidential records; to apply for government and private benefits; to marshal the income and the assets of Mr. Kustka; to pay such bills as may be reasonably necessary to maintain Mr. Kustka; to invest the funds with the same authority as a trustee; to defend or maintain any judicial proceeding; to retain counsel or accountants with their fees being subject to the court’s approval; and to have any other powers that are necessary to carry out the powers specifically enumerated.
The aforementioned powers given to the guardian constitute the least restrictive form of intervention, as required in Mental Hygiene Law § 81.02 (a) (2).
After a period of six months, the guardian will file a report with the court in which he will discuss whether a close relative or friend of Mr. Kustka’s should be appointed as guardian.
In the instant case, a guardian for the personal needs of the alleged incapacitated person was denied and the court appointed a guardian for property management of the alleged incapacitated person. In addition, there was no need to have medical testimony and an independent guardian was appointed for a period of six months, at which time the court will further review the matter and determine whether a relative should be appointed. All of this illustrates the flexibility and tailor-made provisions the court has at its disposal under article 81 of the Mental Hygiene Law.